# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITES STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOMANDO MARK SCOTT,<br><br>Defendant. | 2:10-cr-00430-PMP-RJJ<br><br>**REPORT & RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**<br><br>Defendant's Motion to Suppress (#17) |

This matter comes before the Court on Defendant's Motion to Suppress (#17).  The Court also considered the Government's Response (#26), and the Government's Motion for Leave to File Late Response (#36).  The Court held an evidentiary hearing in this matter on April 25, 2011 and June 1, 2011.

## BACKGROUND

Around 3:15 on August 11, 2010, Constable Thomas Jeeves of the North Las Vegas Constables Office arrived at 724 Roberta Alecia Avenue, North Las Vegas, 89031 in order to execute a Writ of Execution he had posted on the front door of the residence 24 hours earlier.  He was accompanied by a bank representative and a locksmith.  Afer knocking on the door, Constable Jeeves met with the resident of the premises, Lomando Scott.

Scott stated that he had not seen the notice and requested additional time in order to vacate the premises.  Constable Jeeves denied the request and informed Scott that he could have one hour in which to pack up essential belongings and vacate the premises, which would remain

1  in Constable Jeeves' possession until he turned the house over to the bank. Scott was informed
2  that he could pick up his other property at a later date by scheduling a time with the bank. When
3  Constable Jeeves entered the home, he noticed the smell of marijuana and saw Scott stuff four or
4  five stacks of cash into plastic bags, which he then placed into his pockets. The locksmith began
5  changing the locks to the home, and Scott began moving items from the home into his white Ford
6  Expedition, which was parked on the street in front of the house. Having noticed the smell of
7  marijuana and the amount of cash on Scott's person, Constable Jeeves became suspicious and
8  called the North Las Vegas Police Department around 3:38 p.m in order to assist him in securing
9  the house.

10  Officer Jeremy Baker responded to the call and arrived about ten minutes after the call.
11  Also responding to the scene was Officer Alain Villanueva, also of the North Las Vegas Police
12  Department. After an initial search to ensure safety, Constable Jeeves gave the officers
13  permission to search the house more thoroughly. Officers Baker and Villanueva both noticed the
14  smell of marijuana, though Officer Villanueva only entered the house for a few minutes.

15  Officer Baker approached Scott while Scott was in a bedroom packing up some of his
16  belongings. Officer Baker then questioned Scott and obtained his identification in order to run a
17  background check. During their conversation, Scott stated that he had been living at the
18  residence for several months. The background check Officer Baker conducted revealed that
19  Scott had numerous prior felony convictions, including convictions involving firearms and
20  narcotics, and that Scott had failed to update his address in compliance with state registration
21  requirements. As a result of this failure, Scott was arrested. During a search of Scott's person,
22  made incident to arrest, police discovered over $10,000 cash in his pockets.

23  Because of Scott's criminal history, the amount of cash discovered on his person, and the
24  smell of marijuana in the house, the officers contacted the NLVPD Narcotics Bureau. Around
25  5:30 p.m., NLVPD Narcotics Bureau officers responded to the scene, led by Investigator Shayne
26  Skipworth. They were later joined by a canine unit from the Las Vegas Metropolitan Police
27
28

1  Department (LVMPD).  After a search of the house, police discovered twelve grams of cocaine
2  in a bedroom, twelve grams of cocaine in the kitchen, a glass bottle with cocaine residue, scales,
3  and other drug paraphernalia.  They also found an electric bill for the address with Scott's name
4  on it, as well as documents showing that the white Ford Expedition parked outside was registered
5  to Scott.
6        Investigator Skipworth, now the lead officer of the investigation, and other officers were
7  able to peer into Scott's vehicle through the windows.  They observed many items of clothing,
8  electronics, as well as a large, flat screen television.  The officers testified that the Expedition
9  was parked illegally because it blocked part of the driveway, and because the tires appeared to be
10  more than eighteen inches from the curb.  However, no officer ever measured the distance or
11  issued any citation for the alleged parking violation. When the canine unit sniffed the exterior of
12  the car, the dog did not detect any evidence of contraband.
13        Because of the valuable property inside and because of an unsupported allegation that the
14  neighborhood was a high crime area, Investigator Skipworth determined that Scott's vehicle
15  should be impounded in order to protect the NLVPD from any liability should the vehicle or
16  anything inside it be stolen.  Investigator Skipworth testified that, under NLVPD policy, the
17  officer has discretion whether to impound a vehicle, and that an inventory search would be
18  required whether the vehicle was impounded or released to a friend or family member.  He
19  instructed Officer Villanuena to conduct the inventory search.
20        During the inventory search, Officer Villanueva discovered a pillowcase which contained
21  a 9 mm Glock 17 handgun and around 250 grams of rock cocaine.  The crime scene investigation
22  unit of the NLVPD was contacted in order to process the gun into evidence.  Eventually, they
23  arrived and completed their investigation.  Around four hours after Officer Baker originally
24  arrived, he transported Scott to a detention facility.  Sometime after that, the vehicle was towed
25  to a police impound lot.  Investigator Skipworth remained at the scene for five and a half to six
26  hours.
27
28

Scott now asks the Court to suppress the evidence found in his vehicle, arguing that the inventory search violated his Fourth Amendment rights. The Government did not substantively respond to Scott's Motion (#17), but instead sought permission to brief the legal issues after the evidentiary hearing.

**DISCUSSION**

**I. The Government's Response**

The Government did not file a timely response to Scott's Motion to Suppress (#17), but instead sought permission to brief the legal issues following the evidentiary hearing and witness testimony. Government's Response (#26).

For good cause, the court may extend the time period for performing an act. FED. R. CRIM. P. 45(b)(1). In it's initial request (#26), the Government fails to identify any good cause for an extension. In its Motion for Leave to File Later Response (#36), filed after the first half of the evidentiary hearing, the Government argues that filing a late response would not prejudice the Defendant, that the evidentiary hearing had not concluded, and that the Defendant would have an opportunity to reply. However, these arguments must fail and the Government's Response must be stricken.

The Defendant was prejudiced in that the Government knew the substance of his legal argument prior to the hearing but, Scott was not aware of the Government's legal arguments. This would give the Government an advantage during the evidentiary hearing.

A substantive response by the Government also helps the court prepare for an evidentiary hearing by narrowing both the legal and factual issues. If the court is aware of both legal arguments, the hearing is more fruitful, and it facilitates the court's task of applying law to fact.

In addition, the Government failed to comply with LCR 45-1(b). Scott's Motion to Suppress (#17) was filed November 24, 2010. There have been other extensions granted regarding this motion and the hearing accompanying it, but this request is not supported by good cause and will not be granted. As a result, the Government's Response (#26) must be stricken.

**II. The Motion to Suppress**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated." U.S. CONST. amend. IV.  Routine inventory searches are reasonable once a car is lawfully impounded. *South Dakota v. Opperman*, 428 U.S. 364, 372-76 (1976).  There are three reasons why an inventory search is conducted: 1) to protect the owner's property while it remains in police custody; 2) to protect the police against claims or disputes over lost or stolen property; and 3) to protect the police from potential danger. *Opperman*, 428 U.S. at 369 (citations omitted).

However, in order to be reasonable and admissible in federal court, an inventory search must be carried out in accordance with the standard procedures of the local police department. *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989); *see also Colorado v. Bertine*, 479 U.S. 367, 374 n. 6 (1987) (holding that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment"). "[A]n inventory search must not be a ruse for general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Regarding impounding a vehicle, the NLVPD Procedure Manual states:

> Whenever a person operating or in physical control of a vehicle is arrested, the officer has an obligation to ensure the safe keeping of that vehicle.  If the person arrested is the vehicle owner, the officer will ascertain if a friend or relative is reasonably available to take custody of the vehicle. The person arrested must authorize such a release.  If the person refuses to allow another person to take custody of the vehicle or another person is not reasonably available, the vehicle will be impounded for safe keeping.

NLVPD Procedure Manual at Chapter 6.45 p.1, Attached as Plaintiff's Exhibit 14 to Hearing (#37).

As for inventory searches:

> An inventory search may be conducted only after the vehicle has come into lawful police custody.  Typically, this occurs after the driver has been arrested or the vehicle has been involved in an accident.

5

NLVPD Procedure Manual at Chapter 7.35 p. 3, Attached as Plaintiff's Exhibit 14 to Hearing (#37). In order to determine whether the inventory search was reasonable, the Court must determine whether officers complied with NLVPD policies.

Investigator Skipworth testified that "even if somebody else came to collect the vehicle, the same inventory search would have been done and the car would have been released to them just, you know, instead of the tow company." Transcript of Hearing at 157 ll. 6-9 (#35). Previous courts have also found that to be part of NVLPD policy. *See United States v. Kindle*, 293 Fed. Appx. 497, 499 (9th Cir. 2008) (finding that "[i]t is the policy of the NLVPD to conduct inventories of vehicles before either impounding them for safekeeping or releasing them to relatives or friends of the arrested owner"). He also stated that an officer has discretion to release the vehicle to family or a friend as opposed to the tow company. Transcript of Hearing at 156 ll. 9-13 (#35).

However, this testimony seems to contradict the written policy. According to the written policy, before an inventory search may be conducted, the vehicle must be in lawful police custody. Before a vehicle is impounded, the officers have an obligation to ensure the safe keeping of the vehicle and, if the owner of the vehicle is arrested, "the officer *will* ascertain if a friend or relative is reasonably available to take custody of the vehicle." NLVPD Procedure Manual at Chapter 6.45 p.1, Attached as Plaintiff's Exhibit 14 to Hearing (#37) (emphasis added). If the person arrested refuses to authorize someone to take custody or no one is reasonably available, then the vehicle will be impounded for safe keeping. *Id*.

Here, there is nothing in the record that indicates that Investigator Skipworth or any other officer, asked Scott whether family or a friend could reasonably take custody of the vehicle. Nor does the policy contain any room for discretion other than whether another person is "reasonably available." NLVPD Procedure Manual at Chapter 7.35 p. 3, Attached as Plaintiff's Exhibit 14 to Hearing (#37). Further, there is nothing in the written policy that states that an inventory search will be conducted whether or not the vehicle is released to a friend or family member.

Because of these discrepancies regarding what exactly constitutes NLVPD policy, the Court's task of determining whether the officers involved complied with that policy when conducting the inventory search becomes somewhat perplexing.  In any case, the Court need not attempt to divine the exact nature of NLVPD's impound and inventory search policies because the Court finds that the inventory search was a ruse for general rummaging in order to discover incriminating evidence, rather than a search conducted to protect Scott's property or to protect NLVPD from liability.

During the hearing, Investigator Skipworth stated that the decision to impound Scott's vehicle was not based upon the manner in which it was parked.  Transcript of Hearing at 157 ll. 22-25.  He stated that the main purpose for impounding the vehicle was to protect Scott's belongings and to protect NLVPD from any potential liability due to stolen or lost items. Transcript of Hearing at 142-43.  Further, no citation was issued.

At time Investigator Skipworth ordered the inventory search, he knew that Scott had been arrested for failing to register his address. Transcript of Hearing at 147-50 (#35).  He knew Scott's criminal history involved drug and gun crimes, he knew the house smelled of marijuana, he knew that Scott had over $10,000 on his person when he was arrested, he knew that twelve grams of cocaine was found in the master bedroom, and that twelve grams of cocaine had been found in the kitchen, along with other drug paraphernalia.  *Id*.  He also knew that Scott had gone back and forth between the house and the car removing personal items.  *Id*.  Based on all of this information, Investigator Skipworth believed that there might have been additional contraband or evidence of illegal activity inside the vehicle.  Transcript of Hearing at 147 ll. 21-23 (#35).

Furthermore, Investigator Skipworth testified:

> ... if the canine would have alerted, then I would have wrote a search warrant just to be, you know, on the safe side.  I would have wrote a search warrant for the vehicle, but the dog did not alert.

Transcript of Hearing at 150 ll. 5-8.  It was not until after all of this that Investigator Skipworth ordered the inventory search.

7

1   In looking at the evidence, it appears that the alleged parking violations and safe keeping
2   function are pretext, and that the inventory search was conducted in order to discover
3   incriminating evidence. Even without the canine alert, Investigator Skipworth still could have at
4   least attempted to obtain a warrant. From what he knew before the inventory search, it is likely
5   that there were enough facts to establish probable cause for a warrant. Furthermore, he was at
6   the scene much longer than an hour before ordering the inventory search, and obtains telephonic
7   search warrants "[a]ll the time." Transcript of Hearing at 158 ll. 6-15. In this case, the police
8   simply chose not to pursue a warrant and used an inventory search as a means to discover
9   evidence of a crime. No warrant exception applies here.

10   The Government bears the burden of demonstrating that an exception to the warrant
11   requirement applies. *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010); *Fisher v.*
12   *City of San Jose*, 558 F.3d 1069, 1074-75 (9th Cir. 2009). Here, the Government has failed to
13   carry its burden. No timely written response was filed, and no evidence was presented at the
14   hearing to show that NLVPD officers complied with its written policies in impounding and
15   conducting an inventory search of Scott's vehicle. Furthermore, the Court finds that the
16   inventory search was a ruse, conducted in order to search for incriminating evidence.

## RECOMMENDATION

18   Based on the foregoing and good cause appearing therefore,
19   IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the
20   Defendant's Motion to Suppress (#17) be **GRANTED**.

## NOTICE

22   Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation**
23   **must be in writing and filed with the Clerk of the Court within 14 days of service of this**
24   **document.** The Supreme Court has held that the courts of appeal may determine that an appeal
25   has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*,
26   474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the

28

specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 23d day of August, 2011.

_____
ROBERT J. JOHNSTON
United States Magistrate Judge